IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 16, 2016 Session

IN RE ENVY J., ET AL.

Appeal from the Circuit Court for Shelby County
No. CT00370414     Robert L. Childers, Judge

_____

No. W2015-01197-COA-R3-PT – Filed September 22, 2016
_____

Mother appeals the trial court's termination of her parental rights. The trial court terminated her parental rights on the grounds that the children were victims of severe abuse and that mother had failed to financially support the children. The trial court also concluded that termination of parental rights was in the children's best interest. After a thorough review of the record, we conclude that there was not clear and convincing evidence of abandonment by willful failure to support. But, we conclude that there was clear and convincing evidence of severe abuse and that termination was in the best interest of the children. Consequently, we affirm the termination of Mother's parental rights.

**Tenn. R. App. 3 Appeal as of Right, Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Terrell L. Tooten, Memphis, Tennessee, for the appellant, Teshia J.

Herbert H. Slattery, III, Attorney General and Reporter; Rachel E. Buckley, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

### I. FACTUAL AND PROCEDURAL BACKGROUND

On June 21, 2013, a case manager with the Department of Children's Services

("DCS") was in search of Teshia J. ("Mother").  She found Mother, who was eight months pregnant, living at a hotel with one of her children, Envy J., born in December of 2011.  Mother told the case manager that she had been going from her aunt's house to her cousin's house and that she did not have stable housing.  Mother also admitted that she used marijuana every day, including that very day.  Mother claimed, however, that she only smoked marijuana outside to prevent exposing Envy.

The case manager decided to drug test Mother, not only due to her admission of drug use, but also because of her past history with DCS.  The case manager was already involved with two of Mother's older children.  Mother supplied a urine sample in a drug test cup provided by the case manager and gave written consent to the drug screen.  From lines that either appeared or did not appear on the cup, the case manager and Mother could see that the sample tested positive for marijuana, barbiturates, and benzodiazepine.  Envy entered state custody that day.

Also on that day, an investigator with DCS Child Protective Service received a referral that Envy was drug-exposed.  The case investigator later held a Child and Family Team meeting, which included Mother.  During the meeting, the investigator discussed with Mother her drug use.  Mother again admitted to smoking marijuana but denied the use of any other drugs.  The investigator administered a drug test, which was required as part of her duties in a drug-exposed infant case.  Mother's sample tested positive for THC.[1]

Mother gave birth to a son, Gab'iel J., in July of 2013.  The day after his birth, DCS received a referral that Gab'iel was also drug-exposed.  Gab'iel's urine drug screen at birth came back positive for both THC and methamphetamines.  A cord blood test revealed positives for THC and benzodiazepines.  Mother also tested positive for THC at the time of Gab'iel's birth.  On August 16, 2013, Gab'iel entered state custody.

On December 13, 2013, the Juvenile Court of Shelby County, Tennessee, held a hearing on a petition filed by DCS to adjudicate Envy and Gab'iel dependent and neglected.  The juvenile court concluded that there was clear and convincing evidence that the children were dependent and neglected and that Gab'iel was a victim of severe abuse due to Mother's use of drugs while she was pregnant.  The juvenile court also ordered that the children remain in DCS custody and relieved DCS of any obligation to make reasonable efforts toward the return of the children to their pre-removal home.  *See* Tenn. Code Ann. § 37-1-166(g)(2), (4) (2014). Mother appealed the juvenile court's decision to the Circuit Court of Shelby County, Tennessee.  *See id.* §§ 37-1-107(e), -159(a) (2014).

---

[1] THC or tetrahydrocannabinol "is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

While the appeal of the dependency and neglect proceeding was pending, on August 28, 2014, also in circuit court, DCS filed a petition to terminate the parental rights of Mother and the father of Envy and Gab'iel.[2] As grounds for terminating Mother's parental rights, DCS alleged abandonment by failure to support, substantial noncompliance with the permanency plan, and severe child abuse.

Faced with the prospect of separate hearings on the de novo appeal from juvenile court and the petition for termination of parental rights, DCS filed a "motion to join hearing on termination of parental rights petition with dependency and neglect appeal." DCS argued that "[t]he *de novo* appeal and [t]ermination involve the common issue of law and fact of severe abuse, which warrants a joined hearing for the purposes of ensuring consistent rulings, avoiding unnecessary delay, and preserving judicial resources." DCS further argued that "[i]f these cases were heard in two different hearings, unnecessary delay and waste of judicial resources would occur." As authority for the requested relief, DCS cited a memorandum opinion of our Court, an opinion which included a warning that it should not be cited or relied upon in any unrelated case. *See* Tenn. Ct. App. R. 10.

Over Mother's objection, the trial court granted DCS's motion to join the two hearings. However, rather than conducting the hearings concurrently, the court ordered that "the petitions shall be heard consecutively beginning with the *de novo* appeal of the dependency and neglect matter."

The hearing on the appeal of the dependency and neglect proceeding commenced on May 11 and concluded on May 12, 2015. At the conclusion of the proof, the trial court ruled from the bench that both children were dependent and neglected and that Gab'iel was a victim of severe abuse. The trial court also ordered that the children would remain in the custody of DCS.

After ruling on the appeal, the trial court moved immediately into the hearing on the petition for termination of parental rights. Before the presentation of any proof, DCS announced it would not proceed against Mother on the ground of substantial noncompliance with the permanency plan. DCS also asked that the proof of severe abuse presented in the dependency and neglect hearing be considered as evidence in the parental termination hearing. Mother's attorney did not object to DCS's request.

The children's foster mother ("Foster Mother") testified first at the hearing on termination of parental rights. During her testimony, Foster Mother described the children's medical needs, their contact with Mother, their current state, and her hopes for the children's

---

[2] Envy and Gab'iel's father did not participate in the hearing on the petition to terminate parental rights and has not appealed the decision to terminate his parental rights. Therefore, this opinion deals solely with the termination of Mother's parental rights.

3

future. Once Gab'iel came into custody, DCS placed the children with the same foster parents, and as of the hearing date, the foster parents had cared for the children for twenty-one months. When asked about the condition of the children when they were first placed with her, Foster Mother described Gab'iel as having an enlarged heart, respiratory issues, and a flap of skin covering his airway. His respiratory issues required ongoing treatment. Envy, on the other hand, had no special medical needs.

According to Foster Mother, Mother last visited the children in November of 2013. Mother last attended one of the children's medical appointments in October of 2013. Foster Mother testified that Mother had last seen the children during one of her court appearances, which took place on March 2, 2015. Foster Mother related that the children did have at least twice weekly phone calls with Mother. Foster Mother estimated that the calls averaged two or three minutes in duration.

Foster Mother described the children's current state as very happy. Envy participated in dance and music classes, and both children took art lessons and attended Sunday School. In the period of time the children had been with the foster parents, the foster parents had taken them on trips to Washington, D.C., New York, and Atlanta. Foster Mother said the children referred to her as "Mom" and to her husband as "Daddy."

Foster Mother expressed her hope that she and her husband could adopt both children. Both foster parents worked, Foster Mother as a nurse and foster father as a general sales manager, but Foster Mother stated that both of their schedules were flexible and that they shared in fostering responsibilities. On cross-examination, Foster Mother was asked if she had been advised of Gab'iel's drug exposure and the potential for developmental issues and whether, in light of that information, she still desired to adopt the children. Foster Mother responded, "Absolutely."

As she did at the hearing on dependency and neglect, the DCS case manager (the "Case Manager") also testified. Her testimony covered several areas, including Mother's support of and interactions with the children, Mother's interactions with her, and her impressions of the foster parents. The Case Manager stated Mother provided financial support during the first six weeks to two months after Gab'iel's birth, but support ceased after that other than providing snacks for visits. The Case Manager agreed that Mother was able-bodied and capable of being employed while the children were in foster care. At some point in time, which is not clear from the record, Mother's attorney provided Case Manager with a letter verifying that Mother was employed by a cleaning business making approximately $250 per week. Mother also informed the Case Manager that she worked off and on at Williams-Sonoma, but again, no time period was mentioned.

The Case Manager had witnessed the children interacting with Mother. When she supervised visits between Mother and the children, the interactions were appropriate, and

4

Envy referred to Mother as "Mother." However, as Envy has grown older, the Case Manager sometimes had to prompt Envy to refer to Mother as "Mother." The Case Manager observed that, at Foster Care Review Board meetings, Mother would check the children thoroughly every time she saw them. When asked why Mother did that, according to the Case Manager, Mother explained "that anyone could harm her children, and she don't [sic] know if they are harmed or not."

Ultimately, Mother herself became a safety concern for DCS. The Case Manager stopped supervising Mother's visits "because [Mother] kept making threats towards me and other DCS staff." The Case Manager related that Mother,

> stated she was going to beat me up before. She stated she was going to slap me. She stated that if her children were not returned to her on or around December 2013, around that court hearing, that she was going to get me, the Judge, the attorneys and the bailiffs. And the Juvenile Court better have over 1,000 bailiffs out there because she did not care.

The Case Manager described the situation during court proceedings involving Mother and her support group as "volatile."

The Case Manager testified that the children were doing great in the foster home. She stated that Envy initially "had some social issues" apparently because Mother "would not allow [Envy] to play with other children" or "go outside." The Case Manager said that the foster parents loved the children and that they were "really on top of it."

The testimony of the Case Manager concluded DCS's proof. Although Mother had been present for the dependency and neglect hearing, Mother was not present for the hearing on termination of parental rights and was not called to testify. The only proof offered on behalf of Mother was a statement from her attorney concerning his observations of Envy calling Mother "mom" or "mama" in the presence of Foster Mother. The statement was offered, without objection, to rebut the testimony of Foster Mother that the children did not refer to Mother as "Mother."

At the conclusion of the termination of Mother's parental rights hearing, the trial court made findings on the record. The trial court concluded that Mother's parental rights should be terminated based upon abandonment by failure to support and severe child abuse and that termination would be in the children's best interest.

After the trial court stated its findings on the record, a discussion ensued regarding how best to include exhibits on severe child abuse entered in the dependency and neglect proceeding in the record for the parental termination case and the numbering of the exhibits. At this point, Mother's attorney objected to the entry of these exhibits into the parental

termination proceedings. The attorney argued that these exhibits were not actually entered into evidence during the parental termination proceedings, but he would not have objected to their entry had they been introduced during the proceedings. The trial court overruled the objection.

The trial court entered an order finding the children dependent and neglected and a separate order concluding that Mother's parental rights should be terminated on the same date, May 26, 2015.

On appeal, Mother argues that the trial court erred: (1) in admitting certain evidence into the hearing on the petition to terminate Mother's parental rights; (2) in ruling that there was clear and convincing evidence of grounds to terminate Mother's parental rights; and (3) in ruling that that there was clear and convincing evidence that termination was in the best interest of the children.

## II. ANALYSIS

Termination of parental rights is one of the most important decisions courts make. As acknowledged by the United States Supreme Court, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1) (Supp. 2015).

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While fundamental, parental rights are not absolute. The State may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2015). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutory ground exists. Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 2015); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

6

A. CONSECUTIVE PROCEEDINGS

Because the timing of the hearing on termination of parental rights, on the same day as the hearing on dependency and neglect, is intertwined with the other issues raised on appeal, we address first the prudence of conducting such hearings consecutively, one immediately following the other. At least in the context of cases in juvenile court, we have emphasized the distinctiveness of the two types of proceedings:

> A termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding. It is a new and separate proceeding involving different goals and remedies, different evidentiary standards, and different avenues for appeal. The primary purpose of a dependent-neglect proceeding is to provide for the care and protection of children whose parents are unable or unwilling to care for them. The sole purpose of the termination proceeding under Tenn. Code Ann. § 36-1-113 is to sever irrevocably the legal relationship between biological parents and their children.

*In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004). Although some distinctions fall away once dependency and neglect and parental termination proceedings reach circuit court, the goal and remedy of each proceeding remain different. In addition, unless res judicata applies, the trial court must make separate findings in each proceeding based on the proof presented at each respective proceeding. *See In re Shannon P.*, No. E2012-00445-COA-R3-PT, 2013 WL 3777174, at *4 (Tenn. Ct. App. July 16, 2013), *perm. app. denied*, (Tenn. Oct. 16, 2013); *In re Adriana L.*, No. M2013-00646-COA-R3-PT, 2013 WL 5434629, at *3 (Tenn. Ct. App. Sept. 25, 2013), *perm. app. denied*, (Tenn. Dec. 23, 2013).

Here, despite the trial court's prior order denying a joint hearing and the judge's efforts during the hearing, the fact that the hearings were held on the same day seemed to confuse counsel for DCS. At one point during the dependency and neglect hearing, counsel for Mother objected to the admission of a permanent parenting plan on the basis that it was irrelevant to dependency and neglect. Counsel for DCS responded: "Your Honor, . . . I do think that this is a Termination of Parental Rights Hearing and a Dependency and Neglect appeal. It was my understanding we were having this all in one hearing." The trial court quickly corrected counsel, but later in the hearing on dependency and neglect, counsel for DCS made the following admission:

> Yes, Your Honor. I'm so sorry to interrupt you, but while you were back there, there were some kind of housekeeping things that we were going over. There was some confusion, unfortunately, on our part as you are aware, that has got passed around to some other people while [co-counsel] was on leave and I was doing Juvenile Court stuff. And I had – it occurred to me that [co-counsel] and I had apparently misunderstood the prior Order. And we have

been putting on our proof like you were hearing both petitions jointly.

Although we can find no prohibition to conducting hearings on dependency and neglect and termination of parental rights consecutively, the hearings must be distinct. Certainly one method of accomplishing that goal would be to separate the hearings by at least a day or more. Furthermore, evidence admitted in a dependency and neglect hearing should not be relied upon for parental termination unless that evidence was also admitted in the hearing on parental termination. This point brings us to the first of several evidentiary issues raised by Mother.

## B. ADMISSIBILITY OF EVIDENCE

Mother argues that the trial court erred in admitting evidence into the parental termination hearing that had been introduced through witnesses only in the dependency and neglect hearing. If the evidence introduced in the dependency and neglect hearing was properly admitted in the parental termination hearing, Mother poses an alternative argument. Mother claims that the trial court erred in overruling her objections to the admission of the following exhibits introduced during the dependency and neglect hearing: the results from two drug screens; Gab'iel's medical records from the hospital; a DNA test establishing paternity; the findings and recommendations of the juvenile court magistrate relating to the dependency and neglect of Envy and Gab'iel; and the findings and recommendations of the juvenile court magistrate relating to the dependency and neglect of Mother's other children. Finally, Mother argues that the trial court erred in admitting an order terminating her parental rights to two other children, which was first introduced in the parental termination hearing.

The admission or exclusion of evidence is within the trial court's discretion. *In re Melanie T.*, 352 S.W.3d 687, 698 (Tenn. Ct. App. 2011); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999) (citing *Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn.1998); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992)). Although the discretionary nature of the decision does not shield it completely from appellate review, it does result in less rigorous appellate scrutiny. *White*, 21 S.W.3d at 222 (citations omitted). When the trial court's discretionary decision involves a choice among acceptable alternatives, the appellate court may not second-guess the trial court's exercise of its discretion merely because "the trial court chose an alternative the appellate courts would not have chosen." *Id.* at 223 (citing *Overstreet v. Shoney's*, *Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)).

1. Evidence from Dependency and Neglect Hearing

Mother argues that the trial court erred when it admitted evidence, specifically exhibits, previously introduced in the dependency and neglect hearing. DCS asked that the exhibits related to the claims of severe abuse introduced in the dependency and neglect

proceeding be deemed admitted in the parental termination proceeding. Mother claims that she timely objected to this request and that admission of the evidence prejudiced her.

Rule 36(a) of the Tennessee Rules of Appellate Procedure provides, in pertinent part, as follows: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). The Advisory Committee comments explain that the rule "is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." *Id.* cmt. The accepted principle referenced by the comment finds expression, in part, through the contemporary objection rule, which

> is an elementary principle of trial practice. Parties who desire to object to the admission of evidence must make their objection in a timely manner and must state the specific basis for their objection. Parties cannot obtain relief on appeal from an alleged error they could have prevented. Therefore, failing to make an appropriate and timely objection to the admission of evidence in the trial court prevents a litigant from challenging the admission of the evidence on appeal.

*Levine v. March*, 266 S.W.3d 426, 440 (Tenn. Ct. App. 2007) (citations omitted).

During the course of the dependency and neglect proceeding, DCS's realization that the two hearings were not consolidated resulted in a proposal to the trial court. DCS proposed "that the exhibits towards the severe abuse could be used on both cases." That way, DCS reasoned, it would be unnecessary for us "to go get another certified copy of the medical records and other certified copies of those initial orders." The court asked counsel if the request had been discussed, and counsel for Mother responded, "Yes. We are not opposing it."

Later, after making its findings and conclusions on the appeal of the dependency and neglect proceeding, the trial court inquired about the proof that would be offered during the parental termination hearing. Counsel for DCS responded with the following:

> [DCS ATTORNEY 2]: We are going to strike the ground of substantial noncompliance for efficiency's sake, and we would just ask that the severe abuse proof will be our proof for this severe abuse of the TPR.
>
> THE COURT: So you are not going to put on any further proof?
>
> [DCS ATTORNEY 2]: No. We are not going to put on further proof

9

on the severe abuse. So we would only be putting on brief proof about mother's failure to provide financial support and then very little proof on the father. Grounds for the father, which are abandonment by failure to visit or provide support and failure to legitimate and substantial noncompliance -- and best interest. I'm sorry, Your Honor. And best interest of the children.

THE COURT: Okay. [Mother's attorney], do you propose to put on any proof on the termination issue?

[MOTHER'S ATTORNEY]: Again, so I'm understanding, so we are going forward on the termination as to no financial support. And what is the other ground?

[DCS ATTORNEY 2]: Severe abuse.

[DCS ATTORNEY 1]: Severe abuse.

[DCS ATTORNEY 2]: Because we have already put that on, so we won't be putting on any more proof to severe abuse. . . .

[MOTHER'S ATTORNEY]: Then the question to me was what proof am I putting on?

THE COURT: Do you propose to put on any proof on that?

[MOTHER'S ATTORNEY]: I will, yes.

At the conclusion of the proof on the parental termination hearing and after closing arguments, the trial court took a short recess to review notes taken during the hearing before making its ruling. The trial court made its findings of fact and ruled from the bench that Mother's and Father's parental rights should be terminated. Following the court's ruling, counsel for DCS brought up a question dealing with the orders to be entered in both proceedings and the numbering of the exhibits. Counsel for DCS reiterated that they were relying on the exhibits presented in the dependency and neglect hearing for proof of severe abuse for purposes of the termination hearing. At this point, counsel for Mother objected to the entry of and reliance upon exhibits from the dependency and neglect hearing for purposes of the hearing on termination of parental rights. The trial court overruled the objection.

Under these circumstances, we conclude that Mother failed to timely object to the admission of the exhibits from the dependency and neglect hearing in the parental

10

termination proceeding. Counsel for Mother initially expressed his agreement that the exhibits from the dependency and neglect would be admitted in the parental termination hearing. Any doubt concerning what that agreement entailed should have been dispelled when counsel for DCS made its announcement that it intended to put on no further proof regarding severe abuse but was still proceeding on the ground of severe abuse for terminating Mother's parental rights. At that point, counsel for Mother should have objected but failed to do so. Accordingly, we deem the issue waived.

2. Mother's Drug Screens

We next consider Mother's objections unique to specific exhibits admitted by the trial court. In the de novo hearing on the petition to declare Envy and Gab'iel dependent and neglected, the DCS investigator testified about administering a urine drug test to Mother. In conjunction with her testimony, the attorney for DCS moved to enter into evidence drug screen result forms. Mother's attorney objected based on a failure to establish a chain of custody.[3]

Before evidence may be admitted, the authenticity or identity of the evidence must be established. Tenn. R. Evid. 901(a). The Rules of Evidence provide that this prerequisite to admissibility may be satisfied by evidence "that the matter in question is what its proponent claims." *Id*. If a witness is unable to identify the evidence, an unbroken chain of custody must be established. *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000). The chain of custody requirement "'demonstrate[s] that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). In the case of specimens or samples, it is often impossible to establish the exhibit through a single witness because "[s]everal persons have usually handled the specimen before its analysis." *Ritter v. State*, 462 S.W.2d 247, 249 (Tenn. Crim. App. 1970) (citing 21 A.L.R.2d 1216; 29 Am. Jur. 2d Evid. § 830; 32 C.J.S. Evid. § 588(2)). Therefore, "all persons who handle the specimen should be ready to identify it and testify to its custody and unchanged condition." *Id.* Whether a satisfactory chain of custody has been established is "a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof." *Id.*; *see Woods v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2001-03143-COA-R3-CV, 2003 WL 22938947, at *3 (Tenn. Ct. App. Dec.10, 2003).

The DCS investigator testified that in drug-exposed infant cases she is required to conduct a drug screen. A urine drug screen is the first drug screen that is usually performed, and in most instances, DCS conducts the drug screen. As noted above, after obtaining a signature authorizing the drug screen, the donor is provided a drug test cup. The drug test

---

[3] Mother also objected on the basis of hearsay. However, on appeal her argument is based solely on chain of custody.

11

cup is packaged in sealed plastic. According to the testimony, the DCS worker removes the cup from the plastic packaging in the presence of the donor and then examines the cup to confirm that there is nothing in or on the cup. The donor is then handed the cup and requested to provide a urine sample.

The DCS investigator described the process after the sample is supplied as similar to a home pregnancy test. Basically, the drug test cup integrates the sample collection and drug test in a single device. From lines that either appear or do not appear on the drug test cup, the tester and donor are able to see whether the urine sample is positive for certain drugs. A control line appears for each drug that can be detected by the drug screen. If the test is negative for a particular drug, a line will appear opposite the control line. If the test is positive, no line will be present. If the test is faulty, the control line will not appear.

Once the results are visible on the drug test cup, the DCS employee documents the results on the drug screen form, and the donor taking the drug screen signs the form. The drug screen form is kept as part of the case file for that client. In this case, the first urine drug test as reflected on the result form signed by Mother showed positive for THC, a marijuana metabolite. Mother's second urine drug test as reflected on the result form showed positive for THC, barbiturates, and benzodiazepines.

Here, we find Mother's objection based on chain of custody to be misplaced. The witnesses offered by DCS identified the drug screen result forms entered into evidence. Mother signed both forms in the presence of each witness, and the witnesses who testified recorded the results shown on the drug test cups. Therefore, the trial court did not abuse its discretion in admitting the drug screen results over Mother's chain of custody objection.

3. Gab'iel's Medical Records

In the de novo hearing on the petition to declare Envy and Gab'iel dependent and neglected, DCS moved to admit Gab'iel's medical records, which were obtained through a subpoena duces tecum. *See* Tenn. Code Ann. § 68-11-406(a) (2013). The medical records included the results of both a urine drug screen, which was positive for methamphetamines and marijuana, and an umbilical cord blood drug screen, which was positive for benzodiazepine and marijuana. On appeal, Mother asserts that the admission of Gab'iel's medical records was error.

From our review of the record, Mother failed to object to the entry of Gab'iel's medical records. As stated above, failure to make a timely, specific objection in the trial court prevents a litigant from challenging the introduction of inadmissible evidence for the first time on appeal. *See, e.g.*, *Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000). Therefore, we consider this issue waived.

4. DNA Test

Mother does not explain why the admission of the DNA test was prejudicial, and we fail to see how Mother was prejudiced by the admission of the test. The identity of the children's father had no bearing on the grounds for terminating Mother's parental rights and was not considered in the trial court's best interest determination. Consequently, we conclude that the admission of the DNA test establishing paternity of the children, if error, was harmless in this instance. *See* Tenn. R. App. P. 36(b).

5. Prior Juvenile Court Proceeding Relating to Mother's Other Children

Mother argues that the trial court erred in admitting documents from a prior juvenile court proceeding into evidence. The DCS investigator testified about the prior juvenile court proceeding during the dependency and neglect hearing. Specifically, when she received the report alleging that Envy was drug-exposed, the DCS investigator testified that she looked to see if Mother had a history with DCS. Upon researching Mother's history, the DCS investigator discovered a prior petition to adjudicate Mother's seven older children dependent and neglected based upon alleged environmental neglect and a drug-exposed infant and a juvenile court order on the petition finding the child dependent and neglected.

Mother's attorney objected to the testimony and entry of the documents from the prior dependency and neglect proceeding based upon relevance. Mother's attorney also argued that the evidence in question was hearsay. In response, DCS argued that the DCS employees check parent histories in such cases because the parent's history can determine how the DCS employee will approach the parent. In other words, the approach may be different when it is a first report as opposed to the fifth or sixth interaction with the parent. The trial court overruled Mother's objections.

Our Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. But, even if relevant, evidence may still "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. In balancing the evidence's probative value against its potential prejudicial effect, the balance tips in favor of admitting the evidence.

> [W]e have observed that the plain language of the rules "strongly suggests" that when the balance between the evidence's probative value and any prejudicial effect is close, the evidence should be admitted. Therefore, excluding relevant evidence under Rule 403 "is an extraordinary step that should be used sparingly."

13

*Goodale v. Langenberg*, 243 S.W.3d 575, 587 (Tenn. Ct. App. 2007) (internal citations omitted).

We conclude that the trial court did not abuse its discretion by admitting the evidence in question. We find the evidence relevant in that it explained how and why the DCS investigator took the steps she did when contacting Mother. We also conclude that the documents in question, as offered, are not hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted*." Tenn. R. Evid. 801(c) (emphasis added). Here, DCS introduced the evidence to show why the DCS investigator handled the situation with regard to Envy and Gab'iel in the manner she did. Therefore, by definition, the evidence as it was offered at the hearing was not hearsay.

6. Chancery Court Order Regarding Mother's Other Children

Mother also argues that the trial court erred in admitting a chancery court order terminating her parental rights to two of her older children. Mother's attorney states that he objected to the admission of the order and that such admission was "greatly prejudicial" to Mother. DCS argues that the error, if any, was harmless because the order was only introduced to show that Mother knew that using drugs while pregnant could harm her child and that there was other evidence presented of this fact.

At the hearing on the parental rights termination, the DCS family service worker who was assigned to Mother's case testified. Among other things, she testified that Mother's parental rights had been previously terminated to two of her other children. When DCS moved to admit the order terminating her rights into evidence, Mother's attorney objected on the following basis:

> Your Honor, I would object to that document even coming into discussion. It appears to be a document over two of the other children that are not before us. It appears to be an Order about a court and my understanding is that case is presently being appealed as we speak. And I would like to object to that being entered in.

A lengthy discussion then ensued among Mother's attorney, the DCS attorney, the Guardian ad Litem, and the trial court over whether the order terminating parental rights had been appealed. The chancery court entered the order on July 8, 2014, and the time for appeal had clearly expired. Ultimately, the trial court overruled the objection to the admission of the order.

Mother argues on appeal that the "other matters were improperly before the court," "Mother's attorney was never given any of the records as it related to the chancery court matter," and "Mother was greatly prejudiced." However, the only argument presented at the trial court was that the order should not be admitted because it was not a final order.

We only address the specific objection Mother raised at trial. A party may not challenge the introduction of inadmissible evidence on a different basis than that raised at trial. Tenn. R. Evid. 103(a)(1); *see also Welch v. Bd. of Prof'l Resp. for the Supreme Court of Tenn.*, 193 S.W.3d 457, 464 (Tenn. 2006). The rationale for such a rule is to prevent "sandbagging" by the objecting party. As our supreme court explained,

> [a]ny other rule would result in setting a trap for the other side of the controversy. When objection is made to evidence, and specified, this notification may enable opposing counsel to obviate it, and thus make the evidence competent, but, if the party making an erroneous objection should be allowed to withhold a good objection and make that in the appellate court, where there can be no possibility of avoiding the difficulty by other evidence, this would give a very great advantage to the party so withholding his real objection, and result in corresponding disadvantage and injustice to the opposing litigant.

*Middle Tennessee R. Co. v. McMillan*, 134 Tenn. 490, 184 S.W. 20, 24 (1916). Consequently, any objection to admission of the chancery court order raised for the first time on appeal cannot be considered in the absence of plain error affecting substantial rights. *See* Tenn. R. Evid. 103(d).

As stated above, the admission or exclusion of evidence is within the trial court's discretion. *In re Melanie T.*, 352 S.W.3d at 698; *White*, 21 S.W.3d at 222; *Otis*, 850 S.W.2d at 442. By all appearances, any appeal from the chancery court order would have been time-barred at the time of the hearing. Mother certainly had the opportunity to show that an appeal was pending but failed to do so. Therefore, we find no abuse of discretion on the part of the trial court in admitting the order terminating Mother's parental rights to two of her other children.

## C. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

To terminate parental rights, a court must determine by clear and convincing evidence the existence of a statutory ground for termination and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c) (Supp. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved. *See Santosky*, 455 U.S. at 769. The heightened burden serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination

15

of or interference with these rights." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* at 596 (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

On appeal, we review the trial court's findings of fact de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. In termination proceedings, "the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993). We "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), *petition for cert. filed sub. nom*, *Vanessa G. v. Tenn. Dep't of Children's Servs.*, (U.S. Apr. 22, 2016) (No. 15-1317).

The trial court found two grounds supported the termination of Mother's parental rights: (1) severe child abuse against Gab'iel; and (2) abandonment by willful failure to support or make reasonable payments toward the support of the children. On appeal, Mother argues that the evidence was not clear and convincing to support these grounds.

1. Severe Abuse

In its petition to terminate parental rights, DCS alleged that Mother's parental rights should be terminated because Gab'iel was a victim of severe abuse. A parent's rights may be terminated if

> [t]he parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

16

Tenn. Code Ann. § 36-1-113(g)(4). Under this ground for termination of parental rights, a finding of severe abuse against one child can be the basis for terminating parental rights to a sibling, including a half-sibling. Therefore, a finding of severe abuse against Gab'iel could be a ground for termination as to Envy.

Mother argues that the ground of severe abuse as defined in Tennessee Code Annotated § 37-1-102(b)(21)(A)(i) (Supp. 2016), was not supported by the record. That statute states severe abuse is, "The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(21)(A)(i). Mother argues there was no evidence that Mother exposed Gab'iel to serious bodily injury or death.

Our appellate courts have previously held that a mother's ingestion of drugs while pregnant can be considered severe abuse. *See In re Garvin M.*, No. E2013-02080-COA-R3-PT, 2014 WL 1887334, at * 5 (Tenn. Ct. App. May 9, 2014); *In re Benjamin M.*, 310 S.W.3d 844, 848 (Tenn. Ct. App. 2009); *In re Matter of M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *8 (Tenn. Ct. App. Apr. 14, 2005). Severe abuse can be present even where the child does not manifest any lasting physical effect from mother's use of drugs. In *In the Matter of M.J.J.*, the mother had used or ingested methamphetamine, hydrocodone, alcohol, and non-prescribed over-the counter medications. 2005 WL 873305, at *8. When M.J.J. was born, the child suffered from tremors because of prenatal exposure to drugs. *Id.* This Court stated that M.J.J. does not appear to have suffered any lasting results, but nonetheless, the court concluded that the mother's "prenatal drug use constituted severe child abuse for purposes of parental rights termination." *Id.*

We conclude that the facts amply support the trial court's finding of severe abuse. The trial court found Mother tested positive for marijuana, benzodiazepines, and barbiturates. Gab'iel's drug screens were positive for marijuana, methamphetamines, and benzodiazepines. Furthermore, the trial court found that shortly after he was born he suffered from an enlarged heart and a flap of skin covering his airway. Gab'iel will likely have lifelong respiratory issues and special needs.

Mother also argues that the trial court did not make sufficiently specific findings of severe abuse. Mother submits that "the court never stated what particular proof it relied on when making its ruling as to severe abuse"; "the court never state[d] what drugs it believed to be in [Gab'iel's] system"; and the court "did not specify what it relied on to form" the belief that "mother used drugs and used drugs around [Envy]." Under Tennessee Code Annotated § 36-1-113(k), in parental termination cases, a court is required to "enter an order that makes *specific findings of fact and conclusions of law* within thirty (30) days of the conclusion of the hearing." Tenn. Code Ann. § 36-1-113(k) (Supp. 2016) (emphasis added).

17

We conclude that the trial court satisfied the statutory requirements. The trial court made extensive written findings of fact and conclusions of law. Contrary to Mother's assertions, the trial court made very explicit and detailed findings of fact that support the finding of severe abuse.

2. Abandonment by Willful Failure to Support

Mother also argues that the evidence was not clear and convincing that Mother abandoned the children by willfully failing to financially support them. At the parental termination hearing, DCS presented the testimony of the DCS service worker assigned to Mother. She testified that Mother made support payments for approximately two months after Gab'iel's birth but that Mother had not made any payments for the four months leading up to the filing of the petition to terminate parental rights. On cross-examination, Mother presented an order from the Juvenile Court on April 7, 2014, stating that Mother was not in compliance with the permanency plan because she had not gotten a psychological evaluation. The permanency plan also required Mother to make child support payments. Mother used the fact that the order was not based upon failure to pay child support to argue that she had indeed paid child support. However, Mother did not testify and no evidence was presented to contradict the testimony of the DCS service worker.

The trial court found Mother had abandoned the children through her willful failure to financially support them. Under the parental termination statutes, "abandonment" is defined to include "the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2016). If abandonment is premised upon a parent's failure to pay support, the failure to support must be willful in order to lead to termination of parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i).

"Whether a parent failed to . . . support a child is a question of fact." *In re Adoption of Angela E.*, 402 S.W.3d at 640. Whether such failure was willful, however, is a question of law. *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). Based upon our review of the record, we find that the evidence does not preponderate against the trial court's finding that Mother paid no support during the four-month period preceding the filing of the petition to terminate parental rights. Therefore, our resolution of the issue raised by Mother on appeal hinges on whether Mother's failure to support was willful. Our review of Mother's willfulness in failing to provide support to her children is de novo, with no presumption of correctness. *Id.*

"The element of willfulness has been held to be both a statutory and constitutional requirement." *In re C.T.B.*, No. M2009-00316-COA-R3-PT, 2009 WL 1939826, at *4 (Tenn. Ct. App. July 6, 2009). We have previously addressed, in some detail, the meaning of

18

the term "willfulness" as it applies to parental termination proceedings:

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and had no justifiable excuse for not doing so. Failure to visit or support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint or interference with the parent's efforts to support or develop a relationship with the child . . . .
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d at 863-64 (internal citations and footnotes omitted). The financial ability, or capacity, of a parent to pay support must be considered in determining willfulness. If the failure to pay child support is due to financial inability, then a parent has not willfully failed to support the child. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995), *superseded by statute on other grounds*, 1995 Tenn. Pub. Acts, ch. 532, *as recognized in In re Swanson*, 2 S.W.3d 180, 184 (Tenn. 1999) (citing *Pierce v. Bechtold*, 60 Tenn. App. 478, 448 S.W.2d 425, 429 (Tenn. Ct. App. 1969)).

DCS presented scant evidence regarding Mother's ability to pay support during the relevant four-month time period. The DCS service worker testified that Mother told her that she was working for a cleaning business and making $250 a week. Mother provided DCS a letter that was not notarized stating that fact. Also, Mother told the DCS service worker that she was working at Williams-Sonoma. However, the DCS service worker testified that Mother had never given her any paystubs from Williams-Sonoma.

From this proof, we gather little about Mother's income. The testimony of the DCS service worker is the sole evidence as to Mother's income and work history. The evidence presented is seriously lacking in details. For instance, the record does not reveal how many

hours Mother worked, either at the cleaning business or at Williams-Sonoma, or when she was working. In the case of an hourly worker, lack of information concerning the hours worked prevents the court from considering whether the parent is willfully underemployed, which would create an inference of willful failure to support. *See In re Austin D.*, No. E2012-00579-COA-R3-PT, 2013 WL 357605, at *11-12 (Tenn. Ct. App. Jan. 30, 2013) (finding that mother's personal choice not to work contributed to the conclusion that she willfully failed to pay child support).

Based on this record, we are unable to conclude that Mother had the capacity to support her children. *See In re Audrey S.*, 182 S.W.3d at 864 ("Failure to . . . support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."). DCS presented insufficient evidence concerning Mother's income during the relevant time period. Given the heavy burden necessary to interfere with a fundamental constitutional right, the proof offered here was simply insufficient to show that Mother's failure to support her children was willful.

## D. BEST INTEREST OF THE CHILDREN

Having concluded that there was clear and convincing evidence for one ground for termination of Mother's parental rights, we turn to the issue of whether termination is in the best interests of the children. The focus of the best interest analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005). This Court may consider nine, non-exclusive statutory factors in making a best interest determination. Tenn. Code Ann. § 36-1-113(i) (Supp. 2016).[4] Not every factor

---

[4] The relevant statutory factors include:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

20

enumerated in the statute applies to every case because the facts of each case can vary widely. *In re William T.H.*, No. M2013-00448-COA-R3-PT, 2014 WL 644730, at *4 (Tenn. Ct. App. Feb. 18, 2014).

We conclude that there was clear and convincing evidence that termination of Mother's parental rights is in the children's best interests. Several of the statutory factors support this conclusion. We are unable to glean from the record if Mother had made an adjustment of circumstances. She did not present any evidence at the hearing on the petition to terminate her parental rights. The evidence established that Mother had a history of unstable housing and drug use. The trial court also found Mother had committed severe abuse against Gab'iel by continuing to use marijuana during her pregnancy.

The record reveals that Mother failed to maintain regular contact with Envy and Gab'iel. The DCS service worker testified that she initially supervised Mother's visitation with the children. However, after Gab'iel came into DCS custody because of drug exposure, Mother began threatening the DCS service worker, as well as other DCS employees. After December 2013, Mother chose not to participate in visitation with the children. Mother did interact with the children at court appearances. However, as of the date of the hearing, the children had not had any meaningful visitation with Mother for seventeen months.

The record further shows that a change of caretakers would adversely impact the children. Gab'iel will have lasting respiratory issues, and Foster Mother, as a nurse, stated that she was capable of continuing his medical care. The children also seemed to have bonded with the foster parents. The DCS services worker testified that, during visitation, the children would go to Foster Mother for comfort if injured or upset. For Gab'iel, who had been with the foster parents since he was born, the foster parents were the only parents he had known.

Perhaps most importantly, Foster Mother testified at the hearing that she and her

---

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2016).

21

husband wanted to adopt the children. At the time this appeal was heard, these children had spent over two years in foster care, and the foster parents present the best avenue for a permanent home for these children.

### III. CONCLUSION

We conclude that DCS failed to meet its burden of proving that Mother willfully abandoned her children by failure to financially support them. Nonetheless, the record contains clear and convincing evidence to support terminating Mother's parental rights on the remaining ground relied on by the trial court and to support the court's conclusion that terminating Mother's parental rights is in the children's best interest. Therefore, we affirm the decision to terminate parental rights.

_____
W. NEAL MCBRAYER, JUDGE